# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| LANCE C. SHOCKLEY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Case No. 25-3024 |
| | ) | |
| | ) | **Capital Case** |
| RICHARD ADAMS, et al., | ) | **Execution Set for** |
| | ) | **6 p.m. October 14, 2025** |
| Appellees. | ) | |

## OPPOSITION TO APPLICATION FOR STAY

Until now, the Missouri Department of Corrections has never refused an inmate's designation of a spiritual advisor for an execution proceeding. R. Doc. 2-13 at 2. The Department broke with its historic practice because Lance Shockley made an unprecedented, eleventh-hour request: Shockley wants *his daughter* in the execution chamber with him as his spiritual advisor. *Id.*

But the Supreme Court recognized in *Bucklew v. Precythe*, 587 U.S. 119 (2019), common sense dictates that "relatives" of an inmate "obviously would not be allowed into the chamber itself." *Id.* at 150 n.5. Any reasonable person understands that immediate family members pose unique risks to several "compelling governmental interest[s]."

1

*Ramirez v. Collier*, 595 U.S. 411, 427 (2022). That includes risks to: (1) the Department's "compelling interests in both protecting those attending an execution and preventing them from interfering with it"; (2) the Department's "compelling governmental interest" in preventing "interference with the prison's IV lines"; (3) its "compelling governmental interest" in "maintaining solemnity and decorum in the execution chamber"; and (4) its "compelling interest in monitoring an execution and responding effectively during any potential emergency." *Id.* at 429, 431–32. To preserve these compelling interests using the narrowest means, the Department has informed Shockley that he may select *any* spiritual advisor so long as they are not an immediate family member. R. Doc. 2-13.

Shockley rejected this offer, claiming that the Supreme Court's *Ramirez* decision gives him a right to have his daughter with him in the chamber. But Shockley does not seek a straightforward application of *Ramirez*. He wants an untenable extension. Neither the First Amendment nor RLUIPA[1] mandate that result.

---

[1] The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1.

Appellate Case: 25-3024    Page: 2    Date Filed: 10/12/2025 Entry ID: 5567070

## BACKGROUND

Shockley filed this action in federal court on October 9, 2025—two business days before his scheduled execution on October 14, 2025. Over twenty years ago, Shockley murdered Missouri Highway Patrol Sergeant Carl DeWayne Graham, Jr. As Sergeant Graham exited his patrol vehicle after work, Shockley shot him with a high-powered rifle. *State v. Shockley*, 410 S.W.3d 179, 183 (Mo. 2013). The bullet entered Sergeant Graham's back and exited near his neck. *Id.* Sergeant Graham fell to the pavement, fracturing his skull, and Shockley approached and shot the still-living Sergeant Graham in the face and shoulder twice with a shotgun. *Id.* A jury convicted Shockley of first-degree murder in 2009, and a court subsequently imposed a sentence of death. *Id.* at 185–86.

Shockley unsuccessfully challenged his conviction and sentence on direct appeal. *See State v. Shockley*, 410 S.W.3d at 179. Then, he unsuccessfully sought post-conviction relief in state court. *Shockley v. State*, 579 S.W.3d 881 (Mo. 2019). Shockley then filed for extraordinary post-conviction relief under *Hurst v. Florida,* 577 U.S. 92 (2016), which the Missouri Supreme Court denied.

3

Next, he unsuccessfully sought habeas relief in the federal courts. *See, e.g.*, *Shockley v. Crews*, No. 24-1024, 2024 WL 3262022 (8th Cir. Apr. 2, 2024). Shockley then unsuccessfully sought post-conviction relief a second time. *See State v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025) (denying stay of execution). The United States Supreme Court denied every one of Shockley's certiorari petitions. Shockley has a reputation for delay. *Shockley v. Crews*, 696 F. Supp. 3d 589, 620 (E.D. Mo. 2023) ("Shockley has intentionally delayed this Court's proceedings"); Show Cause Order at 1, Doc. 76, *Shockley v. Crews*, 4:19-CV-02520-SRC (E.D. Mo. Sept. 29, 2023); R. Doc. 26 at 14, *Shockley v. Adams et al.*, 4:25-cv-01513-SRC (E.D. Mo. Oct. 11, 2025).

This action—filed in district court three days ago—is Shockley's latest attempt to delay. The Missouri Supreme Court issued a warrant for Shockley's execution nearly four months ago. Execution Warrant, *State v. Shockley*, No. SC90286 (Mo. Jun. 18, 2025). At that time, under the Department's written procedures, Shockley was classified as "Pre-Execution Status." R. Doc. 7-3 at 1, § II.A. A practical impact of this classification is that "all visits," with a minor exception for legal visits, "shall be non-contact (behind glass)." *Id.* at 2, § III.C(2)(c).

4

Despite the policy, Shockley has designated his daughters—Morgan and Summer—as his spiritual advisors, and he demands in-person contact with them shortly before—and during—his execution.

First, Shockley wants his daughter Morgan to be present in the execution chamber with him at the moment of his execution.[2] On August 21, 2025, the Department informed Morgan that immediate family members are ineligible to be spiritual advisors. R. Doc. 2-4 at 2. Two weeks later, Morgan appealed, citing a broadly applicable 2016 Policy that governs "spiritual advisor visits" for "all" inmates, instead of the Policy that governs pre-execution inmates. R. Doc. 2-1 at 1, D5-3.3(I)(B). The Policy contemplates that "immediate family member[s]" might sometimes serve as spiritual advisors, *see id.* at 2, D5-3.3(III)(B)(2)(a), but the Policy also provides that a spiritual advisor's application may be denied "based on safety and security issues," *id.* at 3, D5-3.3(III)(B)(2)(c),

---

[2] Shockley has told this Court that he desires Morgan Shockley to "touch and pray over him." App. at 17, 3, 12, 16, 21, 22, 24. But "touch" was never a component of Shockley's request to the Department—his request was merely for Morgan to "pray with [Shockley] in the chamber . . . ." R. Doc. 15-1 at 21. Likewise, Shockley told the Department he wanted Morgan and Summer to administer communion to him, but he tells this Court that he only wants Summer to administer communion. *Compare* App. at 22, *with* R. Doc. 15-1 at 21.

(h)(2). Citing the broad provision referencing "immediate family" acting as a "spiritual advisor," Morgan's appeal argued that the Department erred in denying her request. R. Doc. 2-4 at 1. The Department denied Morgan's appeal. The Department communicated the denial to Shockley's counsel on September 26, 2025—nearly *two weeks* before Shockley filed this action on October 9, 2025.

Second, Shockley argues that he has a right to an in-person, pre-execution meeting with his daughters in which they will act as his spiritual advisors by administering communion and anointing oil. Shockley first requested this accommodation on October 2, 2025—just twelve days before his execution. R. Doc. 15-1 at 21. Likewise, October 2 is the first time Shockley requested that his daughter be permitted in the execution chamber. R. Doc. 15-1 at 21. Indeed, on September 11, Shockley conceded that he did not know "who he would have present at the execution should it proceed." R. Doc. 15-1 at 4.

Like Morgan, Summer applied to act as Shockley's spiritual advisor, and the Department denied that application on August 12, 2025. R. Doc. 2-11. Summer waited until October 7, 2025—just two days before this suit—to initiate an appeal within the Department. *See* R. Doc. 15-2

6

¶ 9. The Department denied Summer's appeal the next day on October 8, *id.*, and Shockley filed this action in federal district court on October 9—two business days before his execution, R. Doc. 1.

The Department also expeditiously responded to the October 2 request for in-person administration of communion and anointing oil. The Department responded with a formal memorandum on October 6 and email on October 7. R. Doc. 7-1; R. Doc. 2-13. In the October 6 memorandum, the Department affirmed its intention to "grant as much of the request [for a pre-execution meeting] as possible while still preserving institutional safety and security." R. Doc. 7-1 at 2. But as required by the Department's longstanding policy for pre-execution visits, R. Doc. 7-3 at 2, § III.C(2)(c), Shockley's daughters cannot have a contact visit with Shockley shortly before the execution. That said, Shockley's daughters can participate in a non-contact visit (behind glass), in which they may pray and read scripture while a clergy member, (non-family) spiritual advisor, or Shockley's attorney physically administers communion and anointing oil to Shockley. R. Doc. 7-1 at 2–3. The Department also offered Shockley an additional accommodation: two

7

more witness seats beyond the five seats required by statute so that Morgan and Summer may be present at the execution. *Id.* at 4.

Even so, Shockley filed this action on October 9, 2025. The district court ordered expedited briefing. R. Doc. 17. On October 11, 2025, the district court dismissed Shockley's complaint and denied his motion for stay and preliminary injunction. The Court explained that its denial was based on three findings: *first*, that the Department's proposed accommodations do not significantly burden Shockley's religious exercise; *second*, that the Department's proposed accommodations are narrowly tailored to achieve a compelling state interest; and *third* that Shockley has unreasonably delayed in bringing his suit—as part of a broader pattern of delay through litigation.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a preliminary injunction and stay of execution for abuse of discretion. *Jones v. Kelley*, 854 F.3d 1009, 1013 (8th Cir. 2017). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* (quoting *Powell v. Noble*, 798 F.3d 690, 697 (8th Cir. 2017)). A stay of execution is an equitable remedy that

8

is unavailable as a matter of right. *Hill v. McDonough,* 547 U.S. 573, 584 (2006). A request for a stay of execution must meet the standard requirements for all other stay applications. *Id.* That requires assessing: (1) whether the movant has shown "a significant possibility of success on the merits"; (2) the threat of irreparable harm absent a stay; (3) the balance between harm to the movant absent the stay and the injury inflicted on other interested parties if the stay is granted; and (4) the public interest. *See id.*

Additionally, a movant's inequitable delay provides another independent basis for denying a stay. *Bucklew*, 587 U.S. at 150. Courts have "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quotation omitted).

## ANALYSIS

Shockley fails to show that the district court abused its discretion.[3] While all of the arguments that Respondents raised below provide a

---

[3] Shockley has placed facts in his stay application that were never provided to the district court or the Department. For instance, Shockley now claims that he has a special spiritual relationship with his

9

sufficient basis to affirm, *see* R. Doc. 15; R. Doc. 16; R. Doc. 23, three points stand out. *First*, Shockley failed to prove that any of the Department's policies impose a "substantial burden" on his religious beliefs. *Ramirez*, 595 U.S. at 424–25. *Second*, even if the Department did substantially burden his religious beliefs, the Department's accommodations are narrowly tailored and further compelling governmental interests. That is why the Supreme Court acknowledged that a death-row inmate's "relatives" "obviously would not be allowed into the chamber itself." *Bucklew*, 587 U.S. at 150 n.5. And that is why this is the first time that the Department has *ever* refused the designation of a spiritual advisor for execution proceedings. R. Doc. 2-13 at 2. *Third*, Shockley's inequitable delay is sufficient—on its own—to deny his motion for stay.

## I.    The district court did not abuse its discretion in analyzing the stay factors.

---

daughters. *Compare* App. at 23 *with* Doc. 1 (complaint) *and* Doc. 15-1 (emails). As this Court has explained, Shockley cannot modify his claim on appeal. *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (en banc). Shockley is attempting to rectify deficiencies that the district court identified as a basis for its decision.

Appellate Case: 25-3024      Page: 10      Date Filed: 10/12/2025 Entry ID: 5567070

### A. Shockley failed to show a likelihood of success on the merits because the Department's accommodation poses no substantial burden on his religious beliefs.

To trigger heightened scrutiny, Shockley "must" demonstrate that the Department has imposed a "substantial burden" on his religious exercise.[4] *Ramirez*, 595 U.S. at 424–25. Shockley fails to make this showing. As to Shockley's request for a spiritual advisor in the execution chamber, the Department has repeatedly told Shockley that it will accommodate any qualified spiritual advisor of his choice so long as the spiritual advisor is not an immediate family member. R. Doc. 2-13; R. Doc. 7-1. The Department likewise has also offered a pre-execution meeting where Shockley's daughters are present and able to assist in administering of communion and anointing oil while remaining behind glass. R. Doc. 2-13; R. Doc. 7-1.

This dispute has nothing to do with Shockley's ability to engage in a religious exercise, including with a qualified spiritual advisor from Shockley's faith. *See* R. Doc. 2-13; R. Doc. 7-1. The Department did not

---

[4] In his stay application, Shockley attempts to reduce the required showing from "substantial burden" to "implicate." App. at 17. But Shockley's citation to *Ramirez* is incomplete because it omits the further requirement that "The burden on the prisoner's religious exercise must also be "substantial[ ]." *Ramirez*, 595 U.S. at 425 (citations omitted).

deny Shockley's request because his spiritual advisor comes from a disfavored religion, *see Murphy v. Collier*, 587 U.S. 901 (2019), or because he wants his spiritual advisor to provide forbidden "prayer accompanied by touch" during the execution, *Ramirez*, 595 U.S. at 425. Shockley's request was denied because the *only* spiritual advisors that he will accept are his daughters. R. Doc. 2-13; R. Doc. 7-1.

The district court rightly held that Shockley failed to identify a substantial burden on his religious practice. In particular, the district court found that Shockley failed to allege—let alone substantiate—(1) that his daughters are the only acceptable spiritual advisors; (2) that his daughters are the only ministers able or qualified to provide the religious sacraments and rituals he seeks; and (3) that the accommodations offered by prison officials substantially burden, or burden at all, his exercise of religion. R. Doc. 26 at 15–16. As the district court explained, Shockley "leaves [all these essential facts] to be assumed." R. Doc. 26 at 16.

Shockley cites no case holding that a death-row inmate's religious exercise is "substantially burdened" if he cannot have a specific spiritual advisor. Rather, the Supreme Court has merely held that States cannot categorically exclude spiritual advisors from particular faiths, such as

12

Buddhism. *See Murphy*, 587 U.S. at 901. But no Justice has ever suggested that a Buddhist inmate has a right to demand that the Dalai Lama himself serve as a spiritual advisor. Of course, a prison could reject that request without imposing a substantial burden on the inmate's religious exercise. Likewise here, Shockley may have a spiritual advisor of his choosing, just not an immediate family member, with him in the execution chamber. R. Doc. 2–13 at 1. The Department remains willing to allow any other qualified spiritual advisor into the execution chamber. Shockley therefore fails to prove a "substantial burden" on his religious exercise. *Ramirez*, 595 U.S. at 425.

The district court reached these same conclusions. As the district court explained, "the Court finds that the Department's accommodation of allowing Shockley to 'designate a spiritual advisor *who is not related to Mr. Shockley*' to administer communion and anointing, R. Doc. 2-13 at 1 (emphasis in original), does not substantially inhibit or constrain Shockley's conduct or expression of his religious beliefs." R. Doc. 26 at 14 (citing *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As additional, alternative findings, the district court further explained that the Department's accommodations do not "prevent him

13

from expressing adherence to his faith." R. Doc. 26 at 14 (citing *Patel*, 515 F.3d at 813). And the court found that the accommodations did not "deny [Shockley] the ability to engage in his preferred religious activities." R. Doc. 26 at 14 (citing *Patel*, 515 F.3d at 813). Thus, the court found that the Department's decision does not constitute a "substantial burden" on Shockley's free exercise of religion under RLUIPA. R. Doc. 26 at 14.

**B. Shockley failed to show a likelihood of success on the merits because the Department's accommodation is narrowly tailored and furthers several compelling governmental interests.**

In any event, even if heightened scrutiny applies, the Department's accommodation satisfies it. Its decision protects institutional safety, prevents interference with the execution, and guards the solemnity and dignity of the execution. These interests are all independently compelling. *Ramirez*, 595 U.S. at 429, 431–32. As the Department explained in an email to Shockley's counsel, "during the time the spiritual advisor is present in the chamber," *only* the spiritual advisor and offender are in the execution chamber. R. Doc. 2-13 at 2 (emphasis added). Therefore, "[t]he ability of a family member to interfere with the execution by, for instance, tampering with the IV lines is great, and the Department's ability to prevent such interference is zero." R. Doc. 2-13 at

14

2; *see also* R. Doc. 15-2 ¶ 10 (Division Director Myles Strid discussing risks). Pre-execution contact visits with family members also pose obvious safety risks. That is why the Department's longstanding policy— broadly applicable to all death-row inmates—requires pre-execution status inmates to be in maximum-security housing. R. Doc. 7-3 at 1, § III.A(2). And that is why the Department's longstanding policy forbids *all* direct contact visits in such a secure location—giving visitors the option of only non-contact visits (behind glass). *Id.* at 2, § III.C(2)(c). And this makes sense, as the district court agreed. R. Doc. 2-13 at 2. After all, family would have an enormous incentive to interfere with the execution. *Id.*

The Department's decision to abide by its longstanding policy— based on decades of experience from many prison officials—warrants respect from the judiciary. Indeed, "issues of prison management are . . . peculiarly ill-suited to judicial resolution," and "courts should be loath to substitute their judgment for that of prison officials and administrators." *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996) (quotation omitted). This should especially be the case when a prison is acting in accordance with its thoughtfully-considered and longstanding

Appellate Case: 25-3024     Page: 15     Date Filed: 10/12/2025 Entry ID: 5567070

safety procedures. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992) ("Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (cleaned up, quotation omitted)). In making its determination denying the preliminary injunction, the district court, while still exercising its independent judgment, found that the Department and its "legal team have meaningfully engaged in dialogue with Shockley to find reasonable accommodations of his requests." R. Doc. 26 at 6.

Turning to narrow tailoring, Shockley argues that the Department disregarded that his daughters are respectful, law-abiding persons who have never interfered with security while visiting him in prison. He also claims that the Department's concerns could be avoided by requiring Shockley's daughters to sign a penalty-backed pledge promising not to interfere. But, as the district court recognized, R. Doc. 26 at 3, the Department's experience with past executions proves that penalty-backed pledges have little impact, even when the spiritual advisor is not a family member. *See* R. Doc. 15-2 ¶ 11; R. Doc. 15-4 ¶ 4 (in Missouri,

16

"five of [] seven spiritual advisors violated pledges and interview statements substantially similar to the suggestions Lance Shockley references in his complaint.").

And even aside from past disregard of pledges, Shockley's argument misses the point: immediate family members are unique. If given the opportunity, even law-abiding citizens would be hard pressed not to interfere with the execution of their loved one. Recall also that at the moment of the execution, the spiritual advisor is alone with the inmate in the execution chamber, R. Doc. 2-13—making "interference with the prison's IV lines" easy. *Ramirez*, 595 U.S. at 431 ("[P]risons have compelling interests in both protecting those attending an execution and preventing them from interfering with it."). At the very least, the presence of the immediate family member in the chamber is quite likely to harm the State's "compelling governmental interest" in "maintaining solemnity and decorum in the execution chamber." *Ramirez*, 595 U.S. at 432. *Bucklew* stated that "relatives" "obviously would not be allowed into the chamber itself." 573 U.S. at 150 n.5.

Again, this is the first time the Department has ever refused an inmate's request for a designated spiritual advisor during an execution.

R. Doc. 2-13 at 2. Indeed, no lesser restriction can adequately guard the Department's compelling interests. And the district court agreed, finding that, for instance, a written pledge would be insufficient when "over 70% [of recent spiritual advisors] have violated their written pledges." R. Doc. 26 at 3 (citing R. Doc. 15-4 at 1). In his stay application, Shockley contends that these spiritual advisors did not violate their signed agreements "to keep confidential *all information* that I observe or learn . . ." because the spiritual advisors only disclosed information that Shockley does not find important. *Compare* App. at 29 *with* R. Doc. 14-1 at 1, ¶1 (signed spiritual advisor agreements). Shockley's argument is misplaced.

As to the request for a contact visit shortly before the execution, the Department has gone to great lengths to accommodate Shockley. In fact, as explained by the district court, R. Doc. 26 at 12, the Department gave Shockley *four* alternatives:

> (1) Department clergy to provide the communion materials and anointing oil to Mr. Shockley for his own, personal administration; (2) the Department will allow Department clergy (of Mr. Shockley's choosing) to administer the communion materials and anointing oil; (3) the Department will allow Mr. Shockley to designate a spiritual advisor *who is not related to Mr. Shockley*, to have a contact visit and administer the communion materials and anointing oil; or (4)

Appellate Case: 25-3024    Page: 18    Date Filed: 10/12/2025 Entry ID: 5567070

the Department will allow one of Mr. Shockley's attorneys to administer the communion materials and anointing oil.

R. Doc. 2-13 at 1 (emphasis in the original). Importantly, in each of these four scenarios, the Department expressly stated that "Mr. Shockley's daughters may be present on the non-contact side of the visiting area, and they would be permitted to lead the spiritual ritual/proceeding and to provide direction to the person on the contact side of the visiting area." R. Doc. 2-13 at 1. That is the least restrictive means available to guard the Department's compelling interests. And the district court concurred, holding that "Respondents' proposed accommodations demonstrate not hostility towards religion but appropriate respect for it, and they strike a constitutionally permissible balance between Shockley's First Amendment and RLUIPA rights and the government's 'compelling interest in preventing disruptions of any sort and maintaining solemnity and decorum in the execution chamber.'" R. Doc. 26 at 19–20 (quoting *Ramirez*, 595 U.S. at 430).

As noted above, Shockley does not seek a straightforward application of *Ramirez* and *Murphy*. He seeks a dramatic extension. Shockley insists on a specific spiritual advisor—his daughter—to be present with him in the execution chamber. For obvious reasons, no court

19

has ever held that an inmate has a right, under the Free Exercise Clause or RLUIPA, to have their daughter in the execution chamber with them. Accordingly, the district court declined "Shockley's invitation to extend *Ramirez* beyond its holding." R. Doc. 26 at 16–17. Shockley therefore failed to prove a likelihood of success on the merits.

### C. The balance of harms between Shockley and other interested parties weighs heavily against the issuance of a stay.

The State of Missouri, the crime victims—for whom the case has gone on for decades without resolution—and the criminal justice system are all harmed by the never-ending litigation of meritless claims. *See Bucklew*, 587 U.S. at 149–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) (emphasizing that the criminal trial is "a decisive and portentous event" that should be the "main event" in a criminal case, "rather than a 'tryout on the road'" for later litigation). This harm far outweighs any injury to Shockley, who is not harmed by the denial of a stay in meritless litigation. "Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) (quoting *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)). "To unsettle these expectations is

20

to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (quoting *Calderon*, 523 U.S. at 556). Shockley cannot demonstrate that the harms, on balance, are in his favor. Instead, the balance of the harms here weighs heavily in favor of denying the stay.

> **D.** **The public interest is in finality and the performance of the State's lawful and long-delayed criminal judgment.**

"Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149 (quoting *Hill*, 547 U.S. at 584). "Those interests have been frustrated in this case." *Id.* Shockley has exhausted nearly every state and federal avenue for review. And every time, Shockley's claims have been found to be meritless. Shockley has attempted to secure delay through lawsuit after lawsuit. *See Bucklew*, 587 U.S. at 149. "The people of Missouri, the surviving victims of [Shockley's] crimes, and others like them deserve better." *Id.*

Now, at the last minute, Shockley seeks even more delay to raise meritless claims. The public interest lies in the lawful judgment of the State being carried out without additional delay. Shockley is guilty of

21

first-degree murder, a court sentenced him to death. This is now his seventh attempt at delaying the execution of Missouri's lawful sentence. As the district court pointed out, it was dismayed that Shockley is now proclaiming innocence after Shockley did not meaningfully contest his guilt in his 820 pages of habeas briefing. R. Doc. 26 at 17–18. This Court, like the district court, should "question Shockey's *motivations* for pursuing last-minute, and last-ditch, litigation seeking to stay execution." R. Doc. 26 at 18 (emphasis in original). This Court should not delay the execution of the State's lawful judgment any longer.

## II. Shockley's inequitable delay provides another independent basis to deny a stay.

Even if this Court believes that Shockley satisfies all the traditional stay elements, then there is another independently sufficient basis to deny a stay: inequitable delay. Recently, the Supreme Court has reaffirmed in several cases that "late-breaking changes in position, last-minute claims arising from long-known facts, and other 'attempt[s] at manipulation' can provide a sound basis for denying equitable relief in capital cases." *Ramirez*, 595 U.S. at 434 (brackets in original) (quotation

Appellate Case: 25-3024    Page: 22    Date Filed: 10/12/2025 Entry ID: 5567070

omitted); *see Bucklew*, 587 U.S. 150 n.5, 151.

For example, in *Dunn v. Ray*, 586 U.S. 1138 (2019), the Supreme Court vacated the Eleventh Circuit's stay of execution solely because of "the last-minute nature" of the inmate's stay application. *Id.* at 1138. (quotation omitted). The Court explained that the inmate's execution had been scheduled for three months, but the inmate waited until fifteen days before the date of his execution to seek relief. *Id.* Later, in *Bucklew*, the Supreme Court cited *Dunn* as a prime example where a "delay implicated the 'strong equitable presumption' that no stay should be granted 'where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Bucklew*, 587 U.S. 150 n.5 (quoting *Hill*, 547 U.S. at 584).

Shockley's delay is worse than the delay in *Dunn*. Shockley's execution was scheduled nearly four months ago. Execution Warrant, *State v. Shockley*, No. SC90286 (Mo. Jun. 18, 2025). On September 26, 2025, the Department informed Shockley's counsel that it denied Morgan's appeal to serve as Shockley's spiritual advisor. R. Doc. 1 at 9, ¶ 34. Yet Shockley waited to file this action until two weeks later on

Appellate Case: 25-3024     Page: 23     Date Filed: 10/12/2025 Entry ID: 5567070

October 9, 2025. *See* R. Doc. 1 at 9, ¶ 34. That is just two business days before the execution.

Shockley's delay as to the pre-execution contact visit is also inexcusable. Shockley first informed the Department on October 2, 2025, that he wanted a pre-execution visit, with his daughters administering communion and anointing oils. This last-minute request is contrary to the Department's longstanding policy that pre-execution inmates are not entitled to in-person, contact visits. R. Doc. 7-3 at 2, § III.C(2)(c). Accordingly, the Department issued a formal denial of that request on October 6, 2025, R. Doc. 7-1, and Shockley then waited until October 9 to file this suit, R. Doc. 1.

Shockley's delay is "unexplained [] and unexplainable []," and it is a sufficient basis to deny his request for a stay. Order at *5, *State v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025). This is also part of a larger pattern of delay. As several courts, have observed, including the district court, Shockley has repeatedly engaged in a litigation strategy designed to delay. *See Shockley v. Crews*, 696 F. Supp. 3d 589, 620 (E.D. Mo. 2023) ("Shockley has intentionally delayed this Court's proceedings"); Show Cause Order at 1, Doc. 76, *Shockley v. Crews*, 4:19-CV-02520-SRC (E.D.

Mo. Sept. 29, 2023); Order at *2, *5–*6, *State v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025) (denying stay of execution); R. Doc. 26 at 14.

Again, "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149 (quoting *Hill*, 547 U.S. at 584). Shockley murdered Sergeant Graham twenty years ago. He has exhausted nearly every state and federal avenue for review, and every reviewing court has rejected his claims. *See* Order at *1, *State v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025) (denying stay of execution and describing all of Shockley's failed attempts).

The evidence supporting Shockley's conviction was "strong." *Shockley*, 410 S.W.3d at 183–85, 202. The State of Missouri moved to set an execution date on March 31, 2025. *See* Mot., *State v. Shockley*, SC90286 (Mo. Mar. 31, 2025). On June 18, 2025, the Missouri Supreme Court granted the motion and scheduled Shockley to be executed on October 14, 2025. Execution Warrant, *State v. Shockley*, SC90286 (Mo. June 18, 2025). Shockley nevertheless inexcusably delayed—waiting until the eleventh hour to raise the matters at issue in this action.

On this record, it appears that delay for the sake of delay is Shockley's goal. The district court found that Shockley could have

25

brought this suit sooner, but instead "he chose to wait to bring it until after he made other last-ditch attempts to stay his execution." R. Doc. 26 at 18–19 (citing Order, *State v. Shockley*, No. SC90286 (Mo. Oct. 8, 2025)). But "[t]he people of Missouri, the surviving victims of [Shockley's] crimes, and others like them deserve better" than Shockley's delay tactics. *Bucklew*, 587 U.S. at 149. The strong equitable presumption against granting a stay for litigation that could have been completed without a stay if timely filed should be enforced here. *See Hill*, 547 U.S. at 584.

## CONCLUSION

This Court should deny the application for stay of execution.

26

Respectfully submitted,

**CATHERINE L. HANAWAY**
Attorney General

*/s/ Louis J. Capozzi III*
Louis J. Capozzi, III, #77756MO
  *Solicitor General*
*/s/ J. Michael Patton*
J. Michael Patton, #76490MO
  *Deputy Solicitor General*
*/s/ Gregory M. Goodwin*
Gregory M. Goodwin, #65929MO
  *Chief Counsel, Public Protection*
*/s/ Michael J. Spillane*
Michael J. Spillane, #40704MO
  *Assistant Attorney General*
*/s/ Andrew J. Clarke*
Andrew J. Clarke, #71264MO
  *Assistant Attorney General*
*/s/ Kirsten Pryde*
Kirsten Pryde, #76318MO
  *Assistant Attorney General*
*/s/ Tyler A. Dodd*
Tyler A. Dodd, #75531MO
  *Assistant Attorney General*

P.O. Box 899
Jefferson City, MO 65102
(573) 573-7017
Gregory.Goodwin@ago.mo.gov
*Attorneys for Appellees*

## Certificates of Compliance and Service

I hereby certify:

1. This document complies the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,185 words, which is less than the 5,200 words allowed by Fed. R. App. P. 27(d)(2)(A).

2. This document complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in Century Schoolbook 14.

3. This document was electronically filed through the CM/ECF system on this 12 day of October, 2025, and counsel for Mr. Shockley was served thereby.

*/s/ Gregory M. Goodwin*
Chief Counsel, Public Protection

28